# SUPREME COURT OF PENNSYLVANIA

## McCLURE vs· THE WATERTOWN FIRE INSURANCE CO·

A condition in a policy of insurance that it should be null and void "if without the written consent of the company first had and obtained the dwelling house or houses hereby insured become vacant by the removal of the owner or occupant, or cease to be occupied in the ordinary and usual manner that dwelling houses are occupied," is binding upon the insured.

It appeared from the evidence that the dwelling house insured and destroyed by fire was vacated eight or nine days previous to the fire, and remained vacant and unoccupied up to the time of the fire; the consent of the company to such vacation had not been procured. HELD, That evidence to show that the premises were occupied under a lease, and that plaintiff's tenant left the premises without his knowledge and consent, and that as soon as he discovered that fact he endeavored to procure a new one, was properly excluded.

Error to Court of Common Pleas of Cumberland County.

Debt on a policy of fire insurance by William H. McClure, in his own right, and for the use of the First National Bank of Shippensburg, against the Watertown Fire Insurance Company of New York. Plea, payment, with leave, &c.

The facts were as follows: The plaintiff insured his dwelling house and barn in the Watertown Insurance Company, on the 13th day of November, 1876. Being indebted to the First National Bank of Shippensburg, it was provided in the policy that the loss, if any, to the amount of $2,000, should be payable to that bank. The dwelling house was in the occupancy of Thomas Hefflefinger, who held it under a lease from plaintiff, McClure, made the 18th day of April, 1876, for the period of one year, at the time the insurance was made.

The policy contains the following section:

"If the assured without written consent of the company first had and obtained, the dwelling house or houses hereby insured become vacant by the removal of owner or occupant; or cease to be occupied in the usual and ordinary manner that dwelling houses are occupied; or if the building be unoccupied at the time of effecting this insurance and not stated to the company. and so expressed in the application this policy shall be null and void."

The application for insurance exhibits the following questions and answers: "For what occupied? Dwelling. By whom?' Tenant."

Verdict for Defendant.

Opinion by GORDON, J.    June 23, 1879.

William H. McClure, the plaintiff below, accepted the the policy, which is the subject of the present contention, subject to the express condition that it should be null and void "if without the written consent of the company first had and obtained, the dwelling house or houses hereby insured, become vacant by the removal of the owner or occupant, or cease to be occupied in the usual and ordinary manner that dwelling houses are occupied." This provision became part of the contract of insurance. The company agreed to insure the premises at a certain rate, and the plaintiff, in consideration thereof, on his part. agreed that the property should be occupied either by himself or his tenants during the running of the policy, and if at any time it became vacant, then and in that case this policy should be of no further force or effect.

As this condition is unambiguous and reasonable, and, as the plaintiff voluntarily accepted it, *prima facie* it would seem to be obligatory. What reason, then, has the plaintiff to give why it should not be so? The property certainly became vacant without the consent of the company first being had and obtained, and during that vacancy it was burned.

Now, in the case of the Birmingham Fire Insurance Co. v. Kroeger (2 Nor. 64), this court held, that a provision in the policy, providing against the use of carbon oil in and about the insured building, was good and binding upon the insured, and this notwithstanding the knowledge of the company's agent at the time of the insurance, that carbon oil was kept upon the premises. It is therefore certain that provisions, of the character of that now under discussion, are obligatory, and that their violation will avoid a policy of insurance. It will be observed that the case cited and the one in hand are similar, excepting, only,

the objects embraced by the conditions. In the one case there was a prohibition of the use of carbon oil upon the premises; in the other, a prohibition of the vacancy of the insured building; but in both, confessedly, the non-observance of the conditions increased the risk. Why, then, should the ruling of the one not apply to the other?

It is urged that the plaintiff's tenant left the premises without his knowledge and consent, and that, as soon as he discovered that fact, he endeavored to procure a new one. All this may be admitted as true, but then, who was to bear the risk in the meantime? Not the company, for it had expressly provided that it would assume no such risk. What, then, mattered the good intentions of the plaintiff? The fact remained that the loss occurred during the vacancy of the property. Had McClure taken the pains to have notified the company of. the vacation of the building, and obtained its assent thereto, he would have saved his policy. He did not choose so to do, and hence relieved the defendant of its responsibility. It but comes to this: The plaintiff did not live up to his contract, and so lost the advantages of it.

It is true, as is said in the Western Insurance Co. vs. Cropper (8 Cas. 351), that the stipulations in a policy are intended for the benefit of the underwriters, and when they are obscure, they must be interpreted most favorably to the assured, but, on the other hand, to refuse their enforcement when they are not obscure, would be a denial of justice. Then, again, it is not quite correct to say that such stipulations operate wholly to the advantage of the underwriters, since, in consequence thereof, the assured obtains his policy at a lower rate than would be the case were that policy unconditional.

Our attention has been directed to the case of Gamwell v. The Merchant and Farmers' Mutual Fire Insurance Co. (12 Cush. 167), but it is not in point. The defence there was not upon any condition in the policy, but upon an alleged increase of risk, occasioned by the vacation of the insured building, and, also, upon the further allegation that

the loss occurred through the culpable negligence of the assured. These were of course, questions for a jury, and involved, among other things, the good faith of the plaintiff in his alleged endeavors to procure a new tenant as soon as possible after the vacancy occurred. Such, however, is not the question which we have now to consider. It is not whether the risk was increased, or whether the plaintiff acted in good faith, but whether he complied with the condition which he had adopted by accepting the policy.

The ruling of the court below is supported by the case of Harrison vs. The City Insurance Co. (9 Allen, 231), in which it was held, that where the policy contained a condition similar to that now under consideration, the company were relieved from responsibility where the loss occurred during the vacancy of the insured premises. Substantially the same ruling may be found in Keith vs. The Quincy Fire Insurance Co. (10 Allen, 228), and in Corrigan vs. The Connecticut Fire Insurance Co. (122 Mass. 298). The conclusion at which the court below arrived, being thus abundantly supported by reason and authority, must be affirmed.

Judgment affirmed.

W. Trickett, J. A. C. McCune, and W. F. Sadler, Esqs., for plaintiff in error.

S. Hepburn, Jr., and S. Hepburn, Esqs., for defendants in error.

---

In Swindle vs. Poore, (significant title!) 59 Ga. 336, we have a grim touch of humor from the judge. The action was on a note for $154.75, executed in 1862. The jury gave a verdict for $20, and the court below set it aside. This was affirmed, the upper court observing: "If a verdict can shock the moral sense, this does it. Twenty dollars on a note for $154.75, and not a cent ever paid! Doubtless the explanation is, that the note was given during the war. The war destroyed many things, but justice was not killed out. It went through, and is still alive. Private debts are extinguished, not by arms, but by payment, or discharge in bankruptcy, or voluntary release. Debtors cannot fight out of their just obligations to creditors."

# RIGHT OF LANDLORD TO DISTRAIN TWICE FOR SAME RENT.

The law of distraint embraces many questions of general interest.

The judgment delivered lately by Mr. Serjeant Atkinson, at the Wakefield County Court, in the case of Re Duckells and Furness, Ex parte The Leeds Estate Building Society, touched upon not the least interesting of those questions, viz., the right of a landlord to distrain twice for the same rent. The society in this case put in a distress soon after the 30th of November, 1878, for two years' rent. The debtors thereupon represented to the secretary of the society that if the distress was persisted in, the credit of this partnership would be ruined. The society accordingly agreed to withdraw, pending a settlement of the claim. The debtors failed to pay an installment due on the 11th of February, 1879. On the 26th of February a petition in bankruptcy was filed against them, and the society again made a distraint for a year's rent. The trustee in bankruptcy claimed the proceeds of the sale.

Lord Mansfield stated in an early case, the principle upon which a second distress is allowable (Hutchins vs. Chambers, 1 Bur. 579): A man who has an entire duty shall not split the entire sum, and distrain for a part of it at one time, and for the other part at another time. and so *toties quoties* for several times, for that is great oppression. * * * But if a man seizes for the whole of the sum that is due to him, and only mistakes the value of the goods seized, which may be of very uncertain or even imaginary value, as pictures, etc., there is no reason why he should not afterwards complete his execution by making a further seizure. * * * And if he does not take the value of the whole at first, out of tenderness and consideration, perhaps, there is no reason why he should not com-

plete it by a second seizure, provided it is for the same sum due." So according to Baron Parke, in Bagge vs. Mawby, if the tenant has done anything equivalent to saying, "forbear to distrain now, and postpone your distress to some other time," the landlord may again distrain.

Bagge vs. Mawby, 8 Ex. 641, is cited as a case which limits the right to distrain a second time. Half a year's rent being due and in arrear from a tenant who had previously committed an act of bankruptcy, the landlord put in a distress, and was about to proceed with the sale of the goods seized, when in consequence of a notice from a creditor of the tenant, stating that he was taking proceedings in bankruptcy against the tenant, and that he thereby warned the landlord not to sell, and threatened to hold him accountable if he did, the landlord withdrew the distress, without obtaining payment of his rent. At that time no assignee had been appointed, but the tenant was afterwards declared bankrupt, and the creditor who gave the above notice was made assignee. The landlord subsequently distrained a second time for the same rent, but the goods were sold under the direction of the assignee, and the proceeds of the sale were handed over to him. The question before the court was whether the notice that was given by the respondent, who was merely the petitioning creditor, and had no other interest whatever in the property to the landlord, to desist from selling in the first distress, was a good cause or excuse for his abstaining from exercising the power of distress.

The court unanimously answered the question in the negative, being of opinion that the notice was a mere idle threat which the landlord might and ought to have disregarded. It could not be said that the first distress was abandoned by reason of the act of the tenant.

In an action for use and occupation (Deare vs, Edmunds, 2 Chit. 301), the defendants pleaded a distress for rent seized, taken and retained. To this the plaintiff demurred, and the court held that the mere statement of the taking

of a distress, without saying how long the same was detained, is not a satisfaction. The argument in support of the plea was that it stated that the distress was taken on the premises, and the distress was *prima facie* lawful, and that after taking the remedy by distress, the tenant ought not to be harrassed by an action for the rent.

The legality of a second distress was definitely raised in the case of Lee vs. Cooke, 3 H. & N. 203, in the Exchequer Chamber. In that case the defendants, who were the commissioners for draining certain lands, distrained a bean stack of the plaintiff for a rate due from him, and sold the stack by auction, one of the conditions of sale being that the purchaser was to take possession and pay for the same at the fall of the hammer. At the time of the sale the plaintiff said that it would be one thing to buy the stack, and another to take it away, and when the purchaser attempted to remove the stack from the plaintiff's premises, he was forcibly prevented by the plaintiff. The purchaser did not pay for the stack, and the commissioners levied a second distress for the same. The present action was accordingly brought for illegal distress. At the trial the jury found that the purchaser had not at any time an opportunity of taking the stack away, and the judge thereupon directed a verdict for the defendant. The Court of Exchequer had refused to grant a rule to show cause. On appeal it was argued on behalf of the plaintiff that the sale under the first distress was sufficient to satisfy the rates, that as between the defendant and the plaintiff there was a valid distress, and that the illegal conduct of the plaintiff did not divest the property from the purchaser, who might maintain an action of trover against the plaintiff for the value of the stock. The true test, it was said, was whether there was such a delivery of the stack to the purchaser as would satisfy the Statute of Frauds. The decision of the court below was upheld. "The whole question," said Chief Justice Cockburn, "turns upon whether the first distress could have been carried out to its complete accomplishment. It is argued that while the

stack stood on the ground of the plaintiff there was a constructive delivery to the purchaser, and that the fact of possession being resisted with violence, did not justify him in rescinding the contract, but that the remedy was by trover against the plaintiff. In my opinion this is not the correct view. I think that the right of the commissioners was the same as if, having distrained, they had gone to take possession of the stack for the purpose of selling it, and the plaintiff had interposed with violence and prevented them from completing the distress." The rule of law was stated by Mr. Justice Crompton to be that a person cannot distrain a second time for the same cause if he has had an opportunty of making available the first distress; but if by the unlawful act of the distrainee, the distrainor is prevented from realizing, he may distrain again. Bagge vs. Mawby was distinguished on the ground that there a third person threatened the landlord, and thereby caused him to withdraw the distress; so here, if the purchaser had never made any attempt to get possession of the stack, this case would have come within the same principle. The first distress was rendered fruitless by the wrongful act of the plaintiff.

In the case before Mr. Serjeant Atkinson, it was contended by the counsel for the trustee that the case fell within the principle of the decision that where there has been a withdrawal from the distress by the landlord, there having been sufficient goods to satisfy his claim for rent, the power to distrain a second time for the same rent is gone. There was another contention with which we are not here concerned. The judge decided in favor of the society, holding that the second distress was valid, on the ground that the withdrawal of the first distress wat at the request of the debtor and for their accommodation, and that the second distress was consequently goods valid in law. The *ratio decidendi* here adopted is clearly supported by the expressions used by Baron Parke in Bagge vs. Mawby.—The London *Law Times*.